Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, TAAJUDIN ELMAROUK

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAAJUDIN ELMAROUK, on behalf of himself and all similarly situated persons,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>MORGAN STANLEY & CO. LLC, a Delaware limited liability company,<br><br>　　　　　Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff TAAJUDIN ELMAROUK ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant MORGAN STANLEY & CO. LLC, a Delaware limited liability company ("Defendant" or "Morgan Stanley"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.morganstanley.com (the "Website"), a website that Defendant provides for public access and use.

2.    During his use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications and reveal his interest in debt solutions, LGBTQ opportunities and mental illness analysis.

3.    Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing and/or the referrer URLs reflecting prior navigation, which were transmitted to the Third Parties during the page-load process itself.

4.    As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

5.    Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class period in this case and continuously through to today and ongoingly.

## II.   GENERAL ALLEGATIONS

6.   A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7.   When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, session-level identifiers, and browser and device characteristics.

8.   When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The DoubleClick/Google Ads Tracker
- The Bing/Microsoft Tracker
- The Trade Desk Tracker

9.   The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

10.   The Trackers are operated by distinct third parties, including Google LLC (as to the DoubleClick/Google Ads tracker), Microsoft Corporation (as to the Bing Universal Event Tracking tag), and The Trade Desk, Inc. (as to the Trade Desk Real-Time Conversion Pixel) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load and navigation. As a result,

3

Defendant causes the interception and transmission of the contents of users' electronic communications with the Website to servers controlled by the Third Parties. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's deliberate configuration and are not necessary to render the Website's core content or functionality.

11. The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization.

12. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

13. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

### III.   PARTIES

14. Plaintiff TAAJUDIN ELMAROUK is a California citizen residing in Contra Costa County, CA and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period including but not limited to on March 17, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

15.    Morgan Stanley & Co. LLC is a Delaware limited liability company that owns, operates, and controls the Website, an online platform through which Morgan Stanley provides investment banking, wealth management, and personal finance content and services to consumers and institutional clients nationwide.

16.    Morgan Stanley & Co. LLC is one of the largest financial services firms in the world, providing investment banking, wealth management, securities, and financial advisory services to individual and institutional clients. Defendant maintains its principal executive offices in New York, New York. Through its Website and related digital platforms, Morgan Stanley serves millions of consumers in California and throughout the United States.

17.    Morgan Stanley conducts financial services business nationwide and engages in product development, marketing, and commercial operations centered on its digital financial services and content platform. Defendant's business activities include operating the Website, through which consumers browse personal finance articles, research debt management and investment options, and access information about wealth management and financial planning products and services.

18.    The Website, including the mobile site, serves as a core component of Morgan Stanley's digital presence. The Website provides users with access to personal finance articles, investment research, wealth management information, and financial planning tools, and functions as both a marketing platform and a primary consumer-facing content channel through which California users access Morgan Stanley's financial services and editorial content. The Website is integrated into Morgan Stanley's broader digital infrastructure and employs web-based technologies that operate in connection with page loads, navigation, and user interaction.

## IV.    JURISDICTION AND VENUE

19.    Morgan Stanley & Co. LLC is subject to personal jurisdiction in this District. On information and belief, Morgan Stanley maintains offices and wealth management operations throughout California and regularly conducts investment

5

advisory and financial services business in this District.

20. Morgan Stanley has cultivated California as a significant market for its financial services. The Website serves as a primary digital channel through which Morgan Stanley markets its wealth management products, investment advisory services, and personal finance content to California consumers. In furtherance of those operations, Morgan Stanley entered into and maintained commercial partnerships with California-headquartered data and advertising companies, including Google LLC, headquartered in Mountain View, California, and The Trade Desk, Inc., headquartered in Ventura, California.

21. Through those partnerships, Morgan Stanley embedded third-party tracking technologies into the Website that transmit California users' communications to California-based data infrastructure and servers operated by California-headquartered companies. Plaintiff, a California resident, accessed the Website from California; the tortious interception of his communications occurred on his device in California; and the intercepted data flowed to California-based servers. Plaintiff's claims arise directly from Morgan Stanley's purposeful direction of its Website and embedded data-collection systems at California residents and its use of California-based infrastructure to capture and exploit their private communications. Accordingly, the exercise of personal jurisdiction over Morgan Stanley in this Court is proper.

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy.

24. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

exceeds $5,000,000 and there are over 100 members of the proposed class, and the parties are minimally diverse.

25.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves millions of California residents, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, as Plaintiff and other Class Members browsed the Website from within this District; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California customers in this District.

## V.     FEDERAL AND STATE PRIVACY LAWS

### 1.     The California Invasion of Privacy Act (CIPA)

26.     The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

27.     Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

28.     CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein constitute concrete injuries

sufficient to establish Article III standing.

29.    Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.    The Federal Wiretap Act**

30.    The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

31.    The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

32.    In *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020), the Ninth Circuit held that plaintiffs plausibly alleged Facebook was not a "party" to the relevant communications for purposes of the Wiretap Act and Cal. Penal Code § 631(a) party exemption, where Facebook's plug-in code allegedly caused users' browsers, without their knowledge, to duplicate referer-header information from GET requests sent to third-party websites and transmit that information to Facebook through a separate, simultaneous channel. The court concluded that this type of simultaneous, unknown duplication did not entitle Facebook to the party exemption as a matter of law at the pleading stage.

8

33. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. SPECIFIC ALLEGATIONS

34. During his use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- https://www.morganstanley.com/;
- https://www.morganstanley.com/what-we-do;
- https://www.morganstanley.com/insights/topics/personal-finance;
- https://www.morganstanley.com/insights/articles/what-is-a-financial-plan;
- https://www.morganstanley.com/search?text=Debt;
- https://www.morganstanley.com/articles/simplify-your-financial-life-with-debt-consolidation;
- https://www.morganstanley.com/ideas/sustainable-investing-lgbtq-opportunities-demand; and
- https://www.morganstanley.com/articles/mental-illness-in-children--analysis-and-proposed-solutions.

35. Plaintiff alleges on information and belief that the tracking mechanisms described below operated on the Website during Plaintiff's visit and intercepted the contents of his communications with the Website, including from the specific URLs identified above. Each Tracker section below illustrates what occurs during live browser access to those pages.

///

9

**1.** *The Google/DoubleClick Tracker*

36.     Defendant embedded and deployed a Google advertising tracking pixel on the Website, operated by Google LLC through its DoubleClick advertising platform. The DoubleClick tracker monitors website visitor activity, transmits the full URL of each page a visitor views to Google's advertising servers, and simultaneously links browsing activity to persistent identifiers stored on the visitor's browser. Google LLC operates one of the largest digital advertising platforms in the world, using intercepted browsing data to power interest-based advertising campaigns, real-time bidding auctions, and cross-site user profiling.

37.     Figure 1 is a Fiddler Classic raw request capture showing a GET request transmitted from the user's browser to Google's advertising servers at googleads.g.doubleclick.net. The request includes a parameter transmitting the page URL identifying the content the user was browsing, a parameter transmitting a referrer URL reflecting prior navigation on the Website, and a persistent advertiser user identifier, establishing that the content URL and the persistent identifier were transmitted to Google in the same outbound request.

**Figure 1**



/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

38.    Figure 2 is a Chrome DevTools Network capture showing the same DoubleClick request in structured query-string format. The Payload tab confirms that the content URL, referrer URL, page title, and persistent advertiser user identifier all appear together in the same outbound payload, establishing co-appearance of content and identifier in a single intercepting request.

**Figure 2**



39.    Google's servers returned responses to the DoubleClick tracking requests confirming that Google received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

40.    Google LLC and its operators used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity concerning debt management and financial circumstances, to build behavioral profiles, power real-time bidding auctions, enable interest-based advertising campaigns, and facilitate cross-site user tracking through persistent browser-linked identifiers. This commercial use of intercepted content is precisely what the DoubleClick advertising platform is designed and marketed to accomplish.

41.    Google LLC is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those

11

communications as they occurred. Defendant aided and abetted Google LLC's interception by embedding and configuring the DoubleClick advertising tracker on the Website. By causing Google LLC to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**2.    *The Bing/Microsoft Advertising Tracker***

42.    Defendant embedded and deployed a Microsoft Advertising Universal Event Tracking tag on the Website, operated by Microsoft Corporation through its Bing advertising platform. The Bing UET tag monitors website visitor activity, transmits the full URL of each page a visitor views to Microsoft's servers at bat.bing.com, along with the referrer URL reflecting prior navigation, the page title, and a persistent session identifier, all in the same outbound request. Microsoft Corporation uses the intercepted browsing data to power Bing advertising campaigns, build behavioral audience segments, and enable cross-platform user identification.

43.    Figure 3 is a Fiddler Classic raw request capture showing a GET request transmitted from the user's browser to Microsoft's advertising servers at bat.bing.com. The request includes a parameter transmitting the full page URL identifying the content the user was browsing, a parameter transmitting the referrer URL reflecting prior navigation, the page title identifying the subject matter of the article being viewed, and a persistent session identifier, all in the same outbound request.

/ / /

/ / /

/ / /

12

**Figure 3**



44.    Figure 4 is a Chrome DevTools Network capture showing the same Bing UET request in the browser's native Headers view. The Request URL confirms the presence of the full page URL, referrer URL, page title, and persistent identifier parameters in the same outbound request, corroborating the co-appearance of content and identifier in a single intercepting transmission.

**Figure 4**



/ / /

13

45.    Microsoft's servers at bat.bing.com returned responses to the Bing UET tracking requests confirming that Microsoft received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

46.    Microsoft Corporation and its operators used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity concerning mental health content, to build behavioral profiles, power Bing advertising campaigns, and enable interest-based audience targeting across Microsoft's advertising ecosystem. This commercial use of intercepted content is precisely what the Bing Universal Event Tracking platform is designed and marketed to accomplish.

47.    Microsoft Corporation is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring the Bing UET tag on the Website, and Plaintiff never consented to it. By causing Microsoft Corporation to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**3.    *The Trade Desk Tracker***

48.    Defendant embedded and deployed a Trade Desk Real-Time Conversion Pixel on the Website, a programmatic advertising platform operated by The Trade Desk, Inc. The Trade Desk Real-Time Conversion Pixel monitors website visitor activity, transmits the full URL of each page a visitor views to The Trade Desk's servers at insight.adsrvr.org, and simultaneously places persistent cross-site identifiers on the visitor's browser. The Trade Desk, Inc. operates one of the largest demand-side platforms in the programmatic advertising ecosystem, using intercepted browsing data to power real-time bidding auctions and interest-based advertising campaigns across the open internet.

49.    Figure 5 is a Fiddler Classic raw request capture showing a POST request transmitted from the user's browser to The Trade Desk's servers at

14

insight.adsrvr.org/track/realtimeconversion. The request body contains a referrer URL field set to the complete URL of a page the user was browsing on the Website, together with an advertiser identifier and pixel identifier fields, confirming that the content URL and tracking identifiers were transmitted to The Trade Desk in the same outbound POST request.

**Figure 5**

50.     Figure 6 is a Chrome DevTools Network capture showing the same Trade Desk POST request in structured payload format. The Payload tab confirms the referrer URL set to a Morgan Stanley page URL, the advertiser identifier, the pixel identifier, and privacy settings fields that are present but contain empty values, all in the same outbound POST payload, establishing that no active anonymization or privacy controls were applied to the transmitted data.

/ / /

/ / /

15

**Figure 6**



51.    The Trade Desk's servers at insight.adsrvr.org returned HTTP 200 OK responses to the POST requests, confirming that The Trade Desk received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

52.    The Trade Desk, Inc. and its operators used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity concerning debt consolidation and financial circumstances, to build behavioral profiles, power real-time bidding auctions, enable interest-based advertising campaigns, and facilitate cross-site user tracking through persistent cross-session identifiers. This commercial use of intercepted content is precisely what the Trade Desk Real-Time Conversion Pixel is designed and marketed to accomplish.

53.    The Trade Desk, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted The Trade Desk, Inc.'s interception by embedding and configuring the Trade Desk Real-Time Conversion Pixel on the Website. By causing The Trade Desk, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner,

16

Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

## VII.  CLASS ALLEGATIONS

54.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website were intercepted by one or more Trackers between March 17, 2025 and the present.

55.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

56.    COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;

17

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

57.    TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

58.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

59.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII.  FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against All Defendants

60.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

61.    Plaintiff brings this cause of action on behalf of himself and the Class.

62.    California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose,

18

any information so obtained.

63. The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers received human readable copies of URL strings in the same HTTP request or response in which the Website servers received it, while that communication was in transit between Plaintiff's browser and the Website.

64. Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

65. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX.    SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against All Defendants

66. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

67. Plaintiff brings this cause of action on behalf of himself and the Class.

68. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

69.    The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' browsing. As described in the preceding tracker-specific allegations, the Trackers intercepted URL contents in real time, in the same HTTP request or response in which the Website's servers received them, while those communications were in transit.

70.    Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

71.    Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X.    THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against All Defendants

72.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

73.    Plaintiff brings this cause of action on behalf of himself and the Class.

74.    California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

/ / /

20

75. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

76. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

77. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendant used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

78. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and

21

would have bargained for had the exchange been disclosed.

79. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI.   FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against All Defendants

80. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81. Plaintiff brings this cause of action on behalf of himself and the Class.

82. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

83. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

84. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a financial services website providing wealth management, investment banking, and personal finance content does not expect that the specific pages they browse, including pages reflecting personal financial circumstances, LGBTQ identity, and mental health, will be covertly transmitted to multiple separate third-party commercial

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

85. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring three third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications and their transmission to Google LLC, Microsoft Corporation, and The Trade Desk, Inc., where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the financial services and personal finance content website, the sensitivity of the content browsed, the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

86. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII.  FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against All Defendants

87. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88. Plaintiff brings this cause of action on behalf of himself and the Class.

89. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

/ / /

23

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

90.    Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding three third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to Google LLC, Microsoft Corporation, and The Trade Desk, Inc. without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

91.    The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was browsing on a financial services website and transmitted it to multiple third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the nature of the Website and the sensitivity of the content browsed, including pages reflecting personal financial circumstances, LGBTQ identity, and mental health, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent cross-session identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

92.    As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII.  SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against All Defendants

93.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94.    Plaintiff brings this cause of action on behalf of himself and the Class.

///

24

95. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

96. Defendant received a benefit by permitting Google LLC, Microsoft Corporation, and The Trade Desk, Inc. to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

97. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

98. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

99. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

25

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

3. An order enjoining Defendant from continuing the conduct alleged herein;

4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;

6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9. Compensatory and nominal damages for intrusion upon seclusion;

10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

/ / /

/ / /

26

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   April 23, 2026          **LAW OFFICES OF ROSS CORNELL, APC**


By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com


*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED